UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - -X

JOHNATHAN HOLLAND,

                          Petitioner,          <u>REPORT AND</u>
                                               <u>RECOMMENDATION</u>
          - against -
                                               CV 99-5800(DGT)(MDG)
HANS WALKER, Superintendent,

                          Respondent.

- - - - - - - - - - - - - - - - - - - -X

GO, United States Magistrate Judge:

        The petition of Johnathan Holland for a writ of habeas
corpus pursuant to 28 U.S.C. § 2254 was referred to me by the
Honorable David G. Trager to report and recommend.  For the
following reasons, I recommend that the petition be denied.

## **PROCEDURAL BACKGROUND**

        Johnathan Holland (hereinafter referred to as "petitioner"
or "Holland") was charged with three counts of robbery in the
first degree (N.Y. Penal Law § 160.15[3]), two counts of robbery
in the second degree (N.Y. Penal Law §§ 160.10[1], [2][a]) and
one count of assault in the second degree (N.Y. Penal Law §
120.05[6]) for four separate robberies involving victims Laura
Effel, Keith Brooks, David Funck and David Acus.

        On October 5, 1995, a jury found the defendant guilty of one
count of robbery in the first degree for robbing Mr. Brooks and
not guilty on the charges pertaining to robbing Mr. Acus.

Transcript of First Trial ("Tr. I") 740-43.[1]  The jury was
deadlocked on the remaining two charges of robbery and assault
with respect to the robberies of Mr. Funck and Ms. Effel,
resulting in the court declaring a mistrial as to those counts.
Tr. I 744-49.  After a second jury trial in October 1995, a
different jury found defendant guilty of both the Funck and Effel
robberies, as well as assault.  Transcript of Second Trial ("Tr.
II") 347-49.

The petitioner was sentenced to three consecutive terms of
imprisonment of twelve and one half to twenty-five years for each
count of robbery in the first degree and seven and one half to
fifteen years for the count of robbery in the second degree.  He
was also sentenced to a concurrent term of imprisonment of three
and one half to seven years for assault in the second degree.

---

[1]  The docket sheet notes that the State Court record was
filed by respondent early in these proceedings, but this Court
was never able to locate it.  Thus the record reviewed for this
report and recommendation consists of the portions of the trial
transcript annexed as exhibits to the petition ("Pet. Ex."), and
the additional copies of missing pages provided by the District
Attorney's Office requested by this Court.  See Ct. doc. 29.
Because the District Attorney's record was in storage in another
state, the Court received copies of the additional transcripts in
the beginning of March, 2004, supplemented by a second submission
on March 16, 2004.  The complete record for the first trial
consists of the following: Sept. 25, 1995 (pp. 1-226) (copy);
Sept. 26, 1995 (pp. 227-232/204) (copy); Sept. 28, 1995 (pp. 205-
355) (Pet. Ex.); Oct. 2, 1995 (pp. 356-480) (copy and Pet. Ex.);
Oct. 3, 1995 (481-600) (copy and Pet. Ex.); Oct. 4, 1995 (pp.
601-687) (Pet. Ex.), (pp. 688-729) (copy); Oct. 5, 1995 (pp. 730-
752) (copy).
The complete record for the second trial is as follows: Oct.
16, 1995 (pp. 1-93) (copy); Oct. 17, 1995 (pp. 94-162) (copy),
(1-21/29) (copy); Oct. 18, 1995 (30-133) (Pet. Ex.); Oct. 23,
1995 (134-252) (Pet. Ex.); Oct. 24, 1995 (253-316) (Pet. Ex.)
(incomplete), (253-350) (copy).  Copies of the additional
transcripts provided by the District Attorney's Office will be
docketed herewith.

-2-

<u>Post-Verdict State Proceedings</u>

In September 1997, petitioner appealed his conviction to the Appellate Division, Second Department and raised the following claims:

1. "Manifest necessity" was not present and therefore the principles of double jeopardy were violated when a mistrial was granted over defendant's objection;
2. The defendant was denied due process of law because the lineup procedures were unduly suggestive; and
3. The trial court failed to properly exercise its discretion by allowing the prosecution to question the defendant about underlying facts of his prior convictions.

On March 23, 1998, the Appellate Division unanimously affirmed the conviction. <u>People v. Holland</u>, 248 A.D.2d 636, 670 N.Y.S.2d 534 (2d Dep't 1998). The Appellate Division found that the trial court adequately investigated the jury's inability to reach a verdict after the first trial before exercising its discretion to declare a mistrial as to the three remaining counts. <u>Id.</u> at 636-37, 670 N.Y.S.2d at 534. The Appellate Division also held that the questioning of the defendant about prior convictions was proper. <u>Id.</u> (citing <u>People v. Robinson</u>, 203 A.D.2d 491, 493, 610 N.Y.S.2d 591 (2d Dep't 1994)). Finally, the court found meritless Holland's claim that the lineups were unduly suggestive because his refusal to cooperate "created the very condition" he challenged. <u>Holland</u>, 248 A.D.2d at 637 (citing <u>People v. Cobb</u>, 161 A.D.2d 721, 555 N.Y.S.2d 859 (2d Dep't 1990)).

By letter dated April 13, 1998, the petitioner sought leave

to appeal the Appellate Division order affirming his conviction. On June 10, 1998, the Court of Appeals denied this application. People v. Holland, 92 N.Y.2d 853, 699 N.E.2d 444, 677 N.Y.S.2d 84 (1998).

The Petition

Petitioner filed his petition pursuant to 28 U.S.C. § 2254 with this Court on September 20, 1999 (hereinafter the "Pet.") (ct. doc. 2). In his petition, the defendant raises the same three claims raised on appeal, challenging: (1) the denial of his motion to suppress his lineup identifications; (2) the trial court's ruling allowing testimony about defendant's prior convictions;[2] and (3) the declaration of mistrial as to three counts relating to the robberies of Mr. Funck and Ms. Effel. Pet. at ¶ 12(A)-(C); see also Memorandum of Law in Support of Petitioner's Application for a Writ of Habeas Corpus with Supporting Affidavit of Petitioner ("Pet. Supp. Br.") at 3-4.[3]

_____

[2] Although the hearing court addressed this issue at a Sandoval hearing, because defendant never testified at trial, this issue is now moot. In his supplemental Response to Opposition to Petition, counsel for the petitioner concedes that "the issue ... is completely moot since the petitioner did not take the stand at his trial." [Supp.] Response to Opposition to Petition ("Supp. Reply") at 2; see also Letter dated January 23, 2004 from Eleanor Jackson Piel to the Court at 1 ("it was clear that there was no Sandoval claim because the case had been tried and defendant did not take the witness stand.").

[3] In July 2003, petitioner retained new counsel, who, with the Court's permission, submitted a supplemental memorandum to which respondent responded. Ct. docs. 33, 35, 38.

-4-

<u>**PROCEEDINGS BEFORE THE TRIAL COURT**</u>

<u>SUPPRESSION HEARING</u>

The Honorable Abraham Gerges conducted a <u>Wade</u>[4] hearing immediately before the first trial on whether the photographic and lineup identifications by four complainants should be suppressed.[5] Detectives Ronald Orgias and John Landy testified about the procedures used in the lineup and photographic identifications using photo books and/or photo arrays maintained at the 77th Precinct. Defendant also testified.

<u>Photo Array</u>

Mr. Funck viewed photographs at the 77th Precinct on March 12, 1994 and identified the defendant as the suspect depicted in photo No. 737. H. 144-45.

On March 16, 1994, Mr. Acus identified the defendant in a photo array. H. 155-56; 179-84. Detective Landy then presented photo books to Mr. Acus for possible identification of the second suspect, but he again identified the defendant. H. 156.

Ms. Effel also looked at a photo array on the evening of March 16th, but did not recognize either the defendant or the other person who participated in her robbery. H. 160-62; 189-91. She never looked through any photo books. H. 162.

---

[4] <u>See</u> <u>United States v. Wade</u>, 388 U.S. 218 (1967).

[5] The <u>Wade</u> hearing also covered the identification of defendant with respect to a different indictment for robbery and grand larceny for the alleged robbery of John Clomax on March 7, 1994. However, the court denied a motion to consolidate the two cases and the Clomax case ultimately was never tried. <u>See</u> Respondent's Brief at 3, n.1.

On March 23, 1994, Detective Orgias showed Mr. Brooks photographs from both photo books and a photo array. H. 14-20, 82. Although Mr. Brooks did not identify the defendant in the photo books, he did identify defendant after viewing the photo array. H. 19-20.

Lineup

On the evening of March 23rd, based on the four positive identifications and information provided by a Nathan Herbert,[6] Detective Orgias went to look for the defendant. H. 22. At approximately 11:00 p.m., he and Detective Screen arrested the defendant on Flatbush Avenue near Sterling and Park Place. H. 22-24, 91-92, 94.

Detective Orgias had primary responsibility for conducting the lineup that the four victims viewed on March 24, 1994. H. 97. He took Ms. Effel and Mr. Funck to the precinct, arranged for Mr. Acus and Mr. Brooks to get to the precinct on their own, and was responsible for bringing the fillers to the lineup room out of the view of the four victims. H. 30, 38-39; Tr. I 491. The complainants were kept in an area where they could neither see the defendant nor the fillers. H. 28, 30.

Detective Landy went to a local men's shelter to pick up the fillers, selecting five men who physically resembled the defendant. H. 30, 167; Tr. I 497-499. Detective Landy looked at Holland in his holding cell before going to pick up the fillers

---

[6] Mr. Herbert did not testify at the hearing or the trial.

and had, as a reference, a duplicate photograph of Holland.  Id. at 498.

After transporting Holland from his holding cell to the lineup room at around 3:00 p.m., Detective Orgias told the defendant that a lineup was about to take place.  H. 41, 98, 205. Holland responded that the police were trying to set him up and refused to participate.  Id.; H. 108.  At the time that Holland was refusing to be part of the lineup, Detective Orgias instructed the fillers to go into the lineup room.  H. 105.  When the fillers sat down, Detective Orgias testified that the defendant "sprung out of his seat" and began fighting and cursing him and the officers in the room.  Id.; see also H. 42, 106-107. During the ensuing scuffle, the defendant was restrained and his hands cuffed behind him.  H. 43-45, 107.  According to Holland, after the officers handcuffed him, they placed him on the chair and ran a chain through the handcuffs and the chair to prop him up.  H. 213.

Holland confirmed that the first of two scuffles occurred before he left his cell when he refused to participate in the lineups because he was not provided with a lawyer.  H. 206-208. He continued to refuse to submit to the lineups after he was taken to the lineup room, refusing to hold up his number and then taking off his shirt.  H. 210-11.  He claimed that Detective Orgias then "smacked" him and other officers also jumped on him. H. 212-13.  One of the officers backhanded him, giving him a bloody nose.  H. 214.  The officer then wiped blood from

-7-

Holland's face with the bottom part of the shirt that Holland had previously put back on.  Id.

Detective Orgias testified he believed that during the scuffle, Holland's shirt was removed either by the defendant or by the officers present at the time.  H. 44-48, 109-111. Although Detective Orgias did not see Holland put the shirt back on himself after being restrained, the detective believed Holland was able to do so.  H. 111.  According to the defendant, he removed his shirt before the scuffle and put it back on before the lineups began.  H. 208.

Detective Orgias took a photograph of the lineup just before viewing by the victims, which he said accurately depicted the lineup.  See H. 61-62.  In the photograph, the defendant's shirt is on his shoulders, but the shirt sleeves appear to be armless and dangling at the defendant's sides.  Pet. Exh. 3 (color photograph of actual lineup); see also H. 109.  It is unclear from the testimony whether the sleeves dangled for the duration of the lineups.  Id.

In conducting the lineup, Detective Orgias testified that he led each complainant to the lineup room, beginning with Mr. Acus. H.  51.  Detective Orgias informed Mr. Acus that he was to view a lineup and would be looking through a one-way mirror.  H. 51-52. After viewing the lineup, Mr. Acus was led out through another door in the lineup room away from the room where the other complainants were waiting.  H. 53.  The detective used the same procedure for the other witnesses.  H. 53.  Detective Orgias

-8-

testified that no witness who had viewed the lineup had contact with any one who had yet to view it.  H. 55-57.

Detective Orgias also testified that he did not say anything other than explain the procedures for viewing each witness.  H. 55-57.  After preparing the defendant and the fillers for the lineup and returning to the office where the witnesses had been waiting, he did not hear any officers talking about the scuffle between the defendant and the police next door in the lineup room.  H. 115.  Detective Orgias did not say anything to Mr. Acus, the first witness, with respect to the scuffle when he went to take him to view the lineup.  H. 115.  Detective Orgias told Mr. Acus in front of the other witnesses that he was going to view the lineup and did not indicate whether the lineup was going to be the same or different for each complainant.  H. 115-116.

According to Detective Landy, while he was in the waiting room with the complainants, he heard some yelling coming from the lineup room.  H. 169-70.  He could not make out what the defendant was yelling.  H. 170, 199.  None of the complainants made any comments and he did not explain anything to them about the yelling.  H. 198-99.  When Detective Landy sent the complainants out to view the lineup, he no longer heard the defendant yelling.  H. 171-72.  Detective Landy did not have any conversation with any officer or hear any conversation about the yelling before the complainants went to view the lineup.  H. 199.

At the conclusion of each of the four lineups, each victim identified Holland as the person who robbed him or her.  H. 51,

54, 56, 57.

At the close of the testimony, the court found that the March 24th lineups "were conducted properly and in accordance with constitutional mandates" and that "[n]o requests were made by the defendant." H. 236. The court also denied the defendant's motion to suppress the photo array shown to each of the victims. H. 236-38. Following the court's ruling, counsel for the defendant noted that he had not been given the opportunity to present his closing argument. H. 238. The court vacated its decision and heard counsel. H. 239. After hearing the parties' arguments, the court adhered to its original decision. H. 250.

TRIAL TESTIMONY

Testimony Concerning the Lineup

All four complainants testified at trial that while they were waiting to view the lineup, they heard shouting. Tr. I 247 (Funck); 317-318 (Acus); 381 (Effel); 440, 468 (Brooks). Mr. Brooks recognized the voice "as the voice of the guy who mugged me." Tr. I 440, 468. Similarly, Mr. Funck thought that he recognized the voice, "but it was such a different situation" that the shouting did not affect his identification of the defendant. Tr. I 247-49. However, neither Mr. Funck nor Mr. Brooks heard the defendant speak when viewing the lineup. Tr. I 287 (Funck); 470, 473 (Brooks).

Ms. Effel testified that she did not recognize the

defendant's voice when she was sitting in the waiting room, but recognized it on her way to view the lineup. Tr. I 409-10. Mr. Acus did not recognize the yelling voice he heard. Tr. I 318.

Mr. Funck further testified that Detective Orgias "said something about the suspect being difficult -- or an unruly suspect...to all four of us." Tr. I 285. Likewise, Mr. Acus testified that Detective Orgias came in and told the waiting witnesses that "it will be just another couple of minutes because we're having a problem with the defendant." Tr. I 319, 351. On the other hand, Ms. Effel testified that the detective did not enter the waiting room and make a statement about having trouble with a suspect. Tr. I 411.

Before viewing the lineup, the witnesses talked briefly about their own incidents. Tr. I 282 (Funck); 316, 317, 350 (Acus); 380, 387 (Effel); 438 (Brooks). Mr. Funck stated that they did not discuss their assailant's description. Id. at 282. Each witness also testified that his or her identification of the defendant at the lineup was not affected by the shouting, discussions with other witnesses or any other event prior to viewing the lineup. Tr. I 289 (Funck); 316, 321, 324 (Acus); 382 (Effel); 441 (Brooks).

Mr. Funck testified that when he identified the defendant, he noticed that he was "sweaty...appeared angry...looked very agitated." Tr. I 249, 287. However, he did not notice any handcuffs nor anything different about the way the persons in the lineup held their identification cards. Tr. I 249. Similarly,

Ms. Effel testified that she recalled that everyone participating in the lineup had their hands behind their back and that they each had their number cards displayed in front of them.  Tr. I 386-76.  Ms. Effel testified that nothing with respect to the display of the number card affected her identification.  Id.

Detective Landy testified that he did not say anything to the complainants after hearing the noises coming from outside the office and no one asked him anything about them.  Tr. I 506.

Testimony Concerning the Robberies

Brooks Robbery

On the evening of March 9, 1994, Keith Brooks went to 200 Sterling Place to look at an apartment in the building.  Tr. I 420.  Mr. Brooks walked to the apartment building, opened the door leading into the vestibule and rang the bell.  Tr. I 420, 422-25.  As Mr. Brooks waited for a response, another individual, whom Brooks had never seen before and later identified at trial as Holland, also entered the vestibule from outside.  Tr. I 423, 425.  When Mr. Brooks inquired whether the other individual was also there to view the apartment, Holland responded by asking for money.  Tr. I 425.  Thinking that the individual was a panhandler, Mr. Brooks attempted to give 25 or 50 cents.  Tr. I 427.  Holland then pulled out and pointed a six to eight inch knife at Mr. Brooks, reiterating that he wanted money.  Tr. I 427-28.  Mr. Brooks attempted to give Holland "four or five bucks" from his pocket, but Holland asked Brooks for the rest of his money from his wallet.  Tr. I 428-29.  Mr. Brooks got out his

wallet and gave Holland $40.00.  Id.  Mr. Brooks asked and was allowed to keep the wallet.  Id.  After Holland took the money and placed the knife back into his bag, he warned that he would kill Mr. Brooks if followed.  Tr. I 430.  Mr. Brooks waited between 20 and 30 seconds before going to a nearby Chinese restaurant to have someone call the police.  Tr. I 431, 434.

Mr. Brooks also testified that he had no difficulty observing the defendant throughout the entire incident.  Tr. I 425-26, 432.  Mr. Brooks had on the glasses he normally wore and his vision was not impaired by the rain from earlier in the evening.  Tr. I 421-22.  He said the vestibule was "fairly well lit."  Tr. I 424.  Even though the defendant stood about ten feet away throughout most of the robbery, Mr. Brooks testified that nothing was covering or otherwise obstructing his view of Holland's face.  Tr. I 425-26, 428.

Effel Robbery

On the evening of March 8, 1994, Laura Effel entered the vestibule of her apartment building at 295 St. John's Place, carrying a leather purse by a strap over her right shoulder.  Tr. I 358-60; 366-67.  As she inserted her key into the lock of the lobby door, a man she had never seen before walked into the vestibule behind her.  Tr. I 361-62, 366.  When she looked back, the man turned away to look at the doorbells to the right of the lobby door.  Id.  After Ms. Effel opened the door and began to walk into the lobby, the man held the door open to keep it from closing, standing less than four feet away from her.  Tr. I 362-

63.  Ms. Effel recalled asking the man to ring the bell if he was there to visit another tenant.  _Id._

During the exchange between Ms. Effel and the first man, a second man apparently walked into the vestibule and, coming from behind the first man, punched Ms. Effel in the jaw.  Tr. I 363-66.  As she staggered about ten feet into the lobby, the second man, whom Ms. Effel identified at trial as Johnathan Holland, took her purse from her shoulder.  Tr. I 364-68.  After a wallet inside the purse fell to the floor, Holland looked down at the wallet and then at Ms. Effel, telling her that he would kill her if she followed him out of the building.  _Id._  He then grabbed the wallet and ran out of the building with both the wallet and the purse.  Tr. I 370.  The first man Ms. Effel encountered had already run out of the building just ahead of Holland.  Tr. I 366.

Although she did not observe the defendant when he entered the building, Ms. Effel testified that she had an opportunity to look directly at Holland for "at least several seconds" before he ran away.  Tr. I 364, 366, 369.  She further testified that she had good eyesight and that the vestibule and the area immediately outside was well lit.  Tr. I 359-61.

Funck Robbery

On March 10, 1994, at around 10:45 p.m., David Funck encountered a man who Funck identified at trial as the defendant. Tr. I 219; Tr. II 152.  As Funck was walking along Sterling Place between Flatbush and Vanderbilt Avenues, he made eye contact with

-14-

Holland, who was walking toward him about half a block away.  Tr.
I 221-23; Tr. II 151-53.  Thinking that Holland was going to ask
for money, Mr. Funck looked away and attempted to walk past.  Tr.
I 224.

As Holland came within 15 feet of Mr. Funck, he reached into
his right jacket pocket with his left hand and pulled out a large
kitchen knife.  Tr. I 224-26; Tr. II 152.  When Holland told Mr.
Funck to give him money or be killed, Mr. Funck reached into a
black shoulder bag to look for his wallet.  Tr. I 224-27.
Holland pulled the bag away from Mr. Funck to look for the wallet
himself and asked Mr. Funck if that was everything he had.  Tr. I
228.  After Mr. Funck said yes, the defendant then backed up a
few steps and turned around to walk quickly along Sterling Place
toward Vanderbilt Ave.  Id.

Mr. Funck, who lived on Sterling Place, also began walking
down Sterling, staying about half a block behind Holland.  Tr. I
229-30.  When Mr. Funck reached Vanderbilt Avenue, he looked for,
but did not find, police officers.  Tr. I 230.

As Mr. Funck passed Vanderbilt, he called out that he would
give Holland the $20.00 that remained in his pocket in return for
the wallet.  Tr. I 231.  Holland turned around and walked back to
Mr. Funck to make the exchange before departing.  Tr. I 232-33.

Mr. Funck testified that he had no difficulty identifying
the defendant in a lineup.  Tr. I 249-50.  The area of Sterling
Place between Vanderbilt and Flatbush Avenues was very well lit
at the time of the incident and he was standing directly

underneath a street lamp when Holland first approached.  Tr. I
221-222.  Although Mr. Funck had never seen the defendant before
this incident (Tr. I 226, Tr. II 154-55), he had a good look at
Holland when Holland first approached and again when they made
the exchange.  Id. at 224-28, 232-33.

### Acus Robbery

On March 15, 1994 at around 10:00 p.m., as Mr. Acus walked
along Sterling Place between Vanderbilt Avenue and Butler Place,
a man grabbed and held both of Mr. Acus's arms from behind.  Tr.
I 293, 296-97.  A second man, identified at trial as the
defendant (Tr. I 299-300), pulled out and pointed a knife with
five to six inch blade at Mr. Acus and asked where the money was.
Tr. I 299-300.

The first man took Acus's wallet containing $37.00 and
walked quickly away.  Tr. I 301-02.  In response to Holland's
further demand, Mr. Acus gave his watch and jacket to Holland as
well.  Id. at 304, 306.

### JURY DELIBERATIONS

The first trial lasted three and one-half days, with
testimony from David Funck, David Acus, Laura Effel, Keith
Brooks, Detectives Landy and Orgias, and Officer Reindeau.  On
October 4, 1995, following the trial court's jury instructions,
the jurors retired to the deliberation room at 3:30 p.m.  Tr. I
724.  At 5:02 p.m., the jury sent a note to the Court asking to
hear excerpts of certain testimony concerning Acus.  Tr. I 725-

27. The Court informed the jury that "there is no such testimony in the record concerning Acus. There is none. The record is devoid of that[.]" Tr. I 726-27. The jury returned to the deliberating room at 5:11 p.m. Tr. I 727.

The jury sent another note at 6:17 p.m. requesting to have other testimony read and returned for deliberations at 6:40 p.m. Tr. I 727-28. At 7:12 p.m., the Court excused and sequestered the jurors for the evening. Tr. I 728.

The record is not clear when the jury began deliberations the following day though there is no indication the jury did not begin during normal business hours. The jury sent a note to the Court at 11:55 a.m. requesting to have testimony read and an explanation of reasonable doubt. Tr. I 730-31. Before the trial judge explained reasonable doubt, the Court took a lunch recess until 2:00 p.m.[7] Tr. I 731-32. At approximately 2:00 p.m., the Court instructed the jury on reasonable doubt. Tr. I 732-36. At 3:37 p.m., the jury returned to the deliberating room. Tr. I 736.

At 4:30 p.m., the jury sent another note indicating that it could not come to an agreement on five of the six charges. Tr. I 736, 739.[8] In the courtroom, the trial judge instructed as

---

[7] Although the record does not indicate when the court recessed for lunch, based on brevity of the trial court's instructions to the jury, this Court assumes for purposes of this report that the court recessed no later than 12:30 p.m.

[8] The transcript indicates the note was signed at 4:40 p.m. Given the time of the prior events, this was probably a
(continued...)

follows:

> You know, jurors, I would suspect at this time the word
> "trial" has a new meaning among you people, and
> probably a more accurate meaning. Sometimes I joke and
> make flip remarks here and there along the way, and it
> is not meant to demean the importance of the
> proceedings. I think these are important proceedings.
> It's as important as any state in the country. And the
> obligation of a juror is not an easy one, and that's
> why a lot of people cop out of jury duty because they
> just can't do it. That's the truth of it, and just as
> well to find that out in the jury selection process.

Tr. I 736-37.

The trial judge then said to the jury that he would take a

partial verdict. Tr. I 737-38. During his remarks, the

foreperson raised his hand. Tr. I 738. The following dialogue

ensued:

> THE COURT: Now, since you put your hand up, has there
> been any change, Mr. Reilly, in the jury's position
> since I received your last note?
>
> THE FOREPERSON: Yes, there has, your Honor.
>
> THE COURT: Okay, I'm going to disregard your last note
> and I'm going to send you back to the jury room, and
> I'm not suggesting -- I'm not trying to stampede a
> verdict one way or the other. I think you read that
> from my manner. Sometimes I'm a little blunt, but I
> get to the point and I try to get to the point. So you
> go back, and if you want to send me a note, fine. If
> you want to continue deliberating, fine. Thank you.

Tr. I 738-39. At 5:10 p.m., the jury returned to deliberations.

Tr. I 739.

The jury was brought back into the courtroom at 5:50 p.m.

---

[8] (...continued)
typographical error and should have read 4:30 p.m. Tr. I 736,
739 (note marked as Ct. Ex. 6). When the note was read into the
record, the time noted is 4:40 p.m. _Id_. 739.

-18-

following a note signed by the foreperson at 5:40 p.m. Tr. I
739-40, 747 (marking note as Ct. Ex. 7). In response to the
trial court's question, the jury foreperson replied there was a
partial verdict. Tr. I 739-40. The foreperson then announced
that the jury had found the defendant guilty of count three,
robbery in the first degree as to Keith Brooks and not guilty of
counts five and six with respect to the robbery of David Acus.
Tr. I 742-43.

After polling the jury on the partial verdict, the trial
court proceeded to question the foreperson, telling the other
jurors, that "if other people disagree with his answers, put up
your hand and I'll get to you." Tr. I 745.

> THE COURT: Do I understand your note when you say you
> cannot agree on three of the six charges, that you are
> deadlocked on those three, that you have not come in on
> a verdict? Do you think that the jury is deadlocked or
> do you think if you have more time that the issue could
> be resolved by the jury by way of a verdict?
>
> THE FOREPERSON: No, I think it's deadlocked.
>
> THE COURT: It's been my observation of the jury that
> you have been deliberating in good faith and working at
> it. I don't intend to abuse the jury unnecessarily,
> but I have to proceed in a certain way. Do you think
> if you had more time, that you could resolve this
> deadlock that exists at this time?
>
> THE FOREPERSON: No, I don't think so, your Honor.
>
> THE COURT: There has been no movement on the other
> three charges involving Ms. Effel and Mr. Funck for some
> period of time, is that true?
>
> THE FOREPERSON: Yes, sir.

Tr. I 745-46.

After excusing the jury, the court gave defendant's counsel

a few minutes to confer with his client and took a recess at 6:03
p.m.  Tr. I 746-47.  When the court resumed the proceedings at
7:16 p.m. without the jury, the defendant was not present.  Tr. I
747-48.  Following a discussion with the defendant's counsel and
the court officer, the judge stated:

> [T]he defendant's illness is feigned and that it's just
> done, quite frankly, because he received a guilty
> verdict on a very serious count and it's just an
> attitude that he doesn't want to cooperate with this
> court.  Consequently, I'm treating his nonappearance as
> a waiver of his right to be present if, indeed, he has
> a right.  Having taken the verdict in his presence and
> having made all the necessary inquiries in his presence
> for a mistrial, I do now declare a mistrial over the
> defense objection to counts one, two and four.

Tr. I 749.


## **DISCUSSION**

### I.  <u>STANDARDS FOR HABEAS REVIEW</u>

The writ of habeas corpus is available to any person held
"in custody in violation of the Constitution or laws or treaties
of the United States."  28 U.S.C. § 2254(a).  Since this petition
was filed after April 24, 1996, the effective date of the
amendments to the habeas statute contained in the Antiterrorism
and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No.
104-132, 110 Stat. 1214 (1996), the provisions of AEDPA govern to
the extent applicable.  <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362,
402-03 (2000); <u>Boyette v. Lefevre</u>, 246 F.3d 76, 88 (2d Cir.
2001).

AEDPA created a new standard of review intended to "place[]

a new restriction on the power of federal courts to grant writs of habeas corpus to state prisoners." <u>Williams</u>, 529 U.S. at 399. A court reviewing a habeas petition under AEDPA may not grant a writ "with respect to any claim that was adjudicated on the merits in State court proceedings unless" the state court decision was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The two clauses of subsection (1) have "independent meaning." <u>Williams</u>, 529 U.S. at 364. Under the first clause, a state court decision will be considered "'contrary to'" clearly established federal law as determined by the Supreme Court "'if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" <u>Kennaugh v. Miller</u>, 289 F.3d 36, 42 (2d Cir. 2002) (quoting <u>Williams</u>, 529 U.S. at 413).

Under the second clause, a decision is an "unreasonable application" of clearly established Supreme Court law "'if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case.'" <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75, 123 S. Ct. 1166, 1174 (2003) (quoting <u>Williams</u>, 529 U.S. at 413).

In reviewing findings of fact under AEDPA, federal courts must assess whether the state court's determination was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Under this standard, a state court's determinations of fact shall be "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

A state court need not set forth the legal basis for resolution of federal claims in order for the broadly deferential standard set out in AEDPA to apply. See Sellan v. Kuhlman, 261 F.3d 303, 311-12 (2d Cir. 2001). Rather:

> [T]he plain meaning of § 2254(d)(1) dictates [that for] the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment. When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim -- even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan, 261 F.3d at 312.

Prior to bringing a petition for habeas corpus pursuant to 28 U.S.C. § 2254, a petitioner must exhaust the remedies available in state court or demonstrate that "there is an absence of available State corrective process [or] [that] circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b); see Keeney v. Tamayo-

Reyes, 504 U.S. 1, 9-10 (1992); Rose v. Lundy, 455 U.S. 509 (1982).  In order to provide the State with the necessary "opportunity" for review, "the petitioner must 'fairly present' his constitutional claims in each state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim."  Baldwin v. Reese; see also Picard v. Connor, 404 U.S. 270, 275 (1971); Levine v. Comm'r of Corr. Servs., 44 F.3d 121, 124 (2d Cir. 1995); Daye v. Attorney General of the State of New York, 696 F.2d 186, 194 (2d Cir. 1982) (en banc).  A petitioner need not cite "chapter and verse to the U.S. Constitution: in order "to alert the court to the claim's federal nature."  Ramirez v. Attorney General of the State of New York, No. 99 Civ. 2047 (RKW), 2001 WL 1028326, at *6 (2d Cir. Sept. 7, 2001).  In other words, the claims presented by a petitioner to the State appellate courts must be the "substantial equivalent" of the claims he raises in the federal habeas petition.  Picard, 404 U.S. at 278.  A petitioner may satisfy this fair presentation requirement by (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of a claim in terms so particular as to call to mind a specific right protected by the Constitution, or (d) alleging a pattern of facts that is well within the mainstream of constitutional litigation.  Daye, 696 F.2d at 194; see also Strogov v. Attorney General of the State of New York, 191 F.3d 188, 191 (2d Cir.

1999), <u>cert.</u> <u>denied</u>, 530 U.S. 1264 (2000).

When there is no longer any procedural mechanism by which a petitioner may obtain review of his claim, it is deemed exhausted but procedurally defaulted. <u>Harris v. Reed</u>, 489 U.S. 255, 263 n.9 (1989); <u>Grey v. Hoke</u>, 933 F.2d 117, 120 (2d Cir. 1991). As discussed further below, a procedural default will preclude habeas review unless the petitioner can establish "cause" and "prejudice." <u>Id.</u>

Where a defendant has procedurally defaulted by failing to raise a claim on direct review or where other adequate and independent state grounds provide the basis for the state decision, the claims are deemed exhausted for the purpose of federal habeas petitions because no state review is available. <u>Bossett v. Walker</u>, 41 F.3d 825, 829 (2d Cir. 1994), <u>cert.</u> <u>denied</u>, 514 U.S. 1054 (1995). Such claims may be reviewed on the merits only if the petitioner can demonstrate "cause" and actual "prejudice." <u>Murray v. Carrier</u>, 477 U.S. 478, 485 (1986); <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87 (1977). In order to demonstrate "cause," the petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." <u>Murray</u>, 477 U.S. at 488; <u>see</u> <u>also</u> <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 639 (1993). Counsel's failure to recognize the factual or legal basis for a claim, or failure to raise a claim, does not in itself constitute "cause" for a procedural default. <u>Murray</u>, 477 U.S. at 486-87.

II.  PRE-TRIAL LINEUPS

    A.  Suggestiveness and Reliability

    The defendant argues that the lineups and identifications should have been suppressed because they were impermissibly suggestive and that the trial court should have re-opened the hearing as a result of alleged contradictory testimony elicited during the first trial.  He further argues that he was disheveled and appeared agitated during the lineup as a result of the altercations.  The defendant testified that blood had been wiped from his face and onto his shirt before the complainants viewed the lineups.  H. 214-15.  Petitioner also maintains that being handcuffed and not fully clothed during the lineups was unduly suggestive.  Pet. at 3, 9, 21; Pet. Supp. Br. at 23-24.

    The ultimate question of the constitutionality of pretrial identification procedures is a mixed question of law and fact.  Sumner v. Mata, 455 U.S. 591, 597 (1982).  The questions of fact that underlie this ultimate conclusion are governed by the statutory presumption of correctness.  Id.  Thus, whether the witness had an opportunity to observe the crime or was too distracted, and whether the witness gave accurate, detailed descriptions are questions of fact to which the statutory presumption applies.  Id.

    Evidence of pre-trial identification will be excluded if "the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator."  Raheem v. Kelly, 257 F.3d 122, 133 (2d Cir. 2001).  If the court determines

that the procedures were not suggestive, then the identification evidence does not present any due process obstacle to admissibility and no further inquiry by the court is required. Id.

If an identification procedure is unduly suggestive, the court must determine whether the in-court identification was nonetheless independently reliable. Raheem, 257 F.3d at 133. See also Neil v. Biggers, 409 U.S. 188, 199 (1972) (court must determine whether the in-court identification was "so tainted by the pretrial procedures as to be unreliable under the totality of the circumstances"); Dunnigan v. Keane, 137 F.3d 117, 128 (2d Cir. 1998), cert. denied, 119 S. Ct. 101 (1998) (if it finds undue suggestiveness, the court must determine whether other evidence supports the reliability of the identification, independent of the suggestive procedure). As the Second Circuit has noted, "even a suggestive procedure 'does not in itself intrude upon a constitutionally protected interest' if it did not contribute significantly to the identification of the defendant." Raheem, 257 F.3d at 135 (quoting Manson v. Brathwaite, 432 U.S. 98, 113, n.13 (1977)). Some of the factors to weigh in assessing the independent reliability of an identification include:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Neil, 409 U.S. at 199-200; Manson, 432 U.S. at 114; see also

United States v. Kwong, 69 F.3d 663, 666 (2d Cir. 1995); United States v. Tortora, 30 F.3d 334, 338 (2d Cir. 1994).

### Lineup Identifications by Funck, Brooks & Acus

In his initial decision on the record at the suppression hearing, the hearing judge said he based his findings and conclusions on the testimony of the officers whom he found credible. H. 235-36. The judge then generally held that the "lineups were conducted properly and in accordance with constitutional mandates[,]" but vacated his decision to hear argument from defense counsel. H. 236, 239. Counsel contended that the photograph of the lineup confirmed that the defendant, who was handcuffed from the back, looked different from the fillers, who were standing and were able to hold their cards. H. 239-40. After hearing oral argument, the judge adhered to his original decision. H. 250.

Although the hearing judge did not make any specific findings in holding that the lineup was conducted in accordance with constitutional requirements, the judge's ruling, in context, is based on a finding that the procedures used were not suggestive, given the lack of evidence or argument at the suppression hearing on the question of reliability.[9] However,

---

[9] Where a court does not find unduly suggestive procedures were used, "independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury." Jarrett v. Headley, 802 F.2d 34, 42 (2d Cir. 1986); see also People v. Burts, 78 N.Y.2d 20, 24, 571 N.Y.S.2d 418, 420 (1991); People v. Bolden, 197 A.D. 528, 529, 602 N.Y.S.2d 212, 213 (2d Dept. 1993)
(continued...)

even in the absence of an explanation for a state court ruling, this court can rely on the record presented in determining whether to reject a challenge to a state conviction.  Vasquez v. Poole, 331 F. Supp. 2d 145, 158 (E.D.N.Y. 2004) (citing Pinkney v. Keane, 920 F.2d 1090 (2d Cir. 1990) for the proposition that a federal court can affirm denial of habeas relief on grounds other than those relied on by state courts).  As discussed below, the record sufficiently supports the hearing court's implicit finding that the lineup procedures at issue were not impermissibly suggestive.

As Detective Landy testified, all the fillers in the lineups had virtually the same physical appearance as petitioner.  See Tr. I 497-98.  The photograph of the lineup taken by Detective Orgias shows defendant with three fillers with similar builds and haircuts sitting down with identification numbers in front of their bodies.  Tr. I 62; Pet. Ex. 3.  Contrary to defense counsel's contention, all the victims testified at trial that they could not tell that petitioner was handcuffed when they viewed the lineup.  Tr. I 249 (Funck remembered not seeing the men's hands because they were "behind their back[s]"); Tr. II 178 (same); Tr. I 321-23 (Acus testified that all the men, including the defendant, had their hands behind their backs); Tr. I 443

---

[9] (...continued)
("in the absence of proof of suggestiveness, the defendant was not entitled to a further inquiry to ascertain whether [the eyewitness] has an independent source for making an in-court identification").

(Brooks could tell nothing in particular about the petitioner's hands during the lineup).  When asked to describe the defendant at the time of the lineups, none of these victims mentioned that the defendant was not fully clothed or that there was anything unusual about his clothes.  The evidence presented indicates that the defendant's physical appearance on March 24, 1994 in no way impermissibly affected these victims' identification of him.  Tr. I 248-50, 316, 321, 323-24, 438-40, 443.

Although Holland testified at the suppression hearing that he had been hit by some officers, who then used his shirt to wipe blood from his face, the hearing judge rejected Holland's testimony as "incredible and self-serving."  H. 236.  The hearing court's rejection of Holland's testimony that his shirt was bloodied or that he was provoked by officers is entitled to a presumption of correctness.[10]  28 U.S.C. § 2254(e)(1).  Further, the testimony of the officers found credible by the hearing judge is corroborated by the trial testimony of the complainants that there was nothing distinctive about defendant's appearance at the lineups they viewed.  Thus, I find that the state court's decision that the lineups were properly conducted and hence, not based on unnecessarily suggestive procedures, is neither an

---

[10]  The stains are not apparent from the photographs taken of the lineup.  See Pet. Ex. 3 (photographs identified as H. Exs. 6A and 6B).  In any event, small and not obvious blood stains would not have made the procedure suggestive.  See, e.g., United States v. Bin Laden, 132 F. Supp. 2d 168, 197 (S.D.N.Y. 2001) (a few blood stains would not "[i]n and of themselves, ... have made the procedure suggestive").

unreasonable application of federal law nor based on unreasonable determinations of the facts.

To the extent that Holland's appearance may have stood out at the lineup, the state appellate court found that he was responsible for his conduct:

> By refusing to cooperate, the defendant created the very condition which caused the police to handcuff him, and, as such, he waived his right to claim error as a result.

Holland, 248 A.D.2d at 637.

The hearing record amply supports a finding that defendant was handcuffed and may have appeared agitated and angry, only because he refused to cooperate. H. 42-45, 106-08, 206-08, 210-11. Thus, the state court decision that Holland had waived his right to challenge the suggestiveness of the line-up procedures is not an unreasonable application of clearly established federal law. Cf. Gilchrist v. O'Keefe, 260 F.3d 87, 95-95 (2d Cir. 2001) (a defendant can lose his right to be present at trial because of disorderly and disruptive behavior); Boothe v. McLellan, 803 F. Supp. 586, 589-90 (E.D.N.Y. 1992) (petitioner's misconduct and disruptive behavior during voir dire warranted being bound and gagged);[11] see also People v. Yates, 456 N.E.2d 1369, 1380 (Ill.

---

[11] Mistakenly relying on Cotto v. Herbert, 331 F.3d 217 (2d Cir. 2003), petitioner argues that, irrespective of any misconduct on his part, the state court "could not deny him the right to have an improperly suggestive identification suppressed, or at the very least have a hearing/finding that the witnesses had an independent source for their identifications." Pet. Supp. Br. at 27. However, unlike the due process claim raised by petitioner as to the propriety of identification procedures used,
(continued...)

1983), <u>cert.</u> <u>denied</u>, 466 U.S. 981 (1984) (the "defendant will not be permitted to challenge its sufficiency because of his own misbehavior" in the lineup, because "[i]t would ... be little short of ridiculous to hold that because defendant's misconduct during a lineup focused attention upon him the integrity of subsequent in-court identification would otherwise be satisfactory").

In any event, the identifications were independently reliable. The victims had a significant opportunity to see the defendant during the commission of the robbery. <u>See,</u> <u>e.g.</u>, <u>United States v. Wong</u>, 43 F.3d 1347, 1357 (2d Cir. 1994) (witness stared at the face of defendant for "two to three seconds while he looked at her"); <u>United States v. Concepcion</u>, 983 F.2d 369, 379 (2d Cir. 1992), <u>cert.</u> <u>denied</u>, 510 U.S. 856 (1993) (witness had "just a quick look" at criminal as entire incident took five to seven seconds). Mr. Brooks had an unobstructed view of Holland's face in the "fairly well lit" vestibule where the robbery took place to be able to identify Holland at a later time. Tr. I 424-26, 428, 432.

---

[11] (...continued)
the issue in <u>Cotto</u> concerned the violation of the defendant's Confrontation rights under the Sixth Amendment when the trial court admitted a witness's out-of-court identification at trial. 331 F.3d at 228-29. As the Second Circuit acknowledged in <u>Cotto</u>, "[a]lthough the Sixth Amendment generally bars the admission of out-of-court statements without an opportunity for cross-examination, <u>see</u> <u>Douglas v. Alabama</u>, 380 U.S. 415, 418-19 (1965), "in limited circumstances, a defendant's intentional misconduct can constitute a waiver of his Confrontation Clause right." 331 F.3d at 231 (citing <u>Illinois v. Allen</u>, 397 U.S. 337, 343 (1970)).

Mr. Funck encountered the defendant twice: first when Holland robbed him directly under a street lamp and later when Holland returned Funck's wallet in exchange for money. Tr. I 224-28, 232-33. Mr. Funck testified that during the robbery, he was directly beneath a street lamp and was certain he could see the defendant very well. Tr. I 221-22. Having viewed the lineup two weeks after the commission of the crime, Mr. Funck indicated that he was "very confident" at the conclusion of the lineup that he had correctly identified the person who had robbed him. Tr. I 287.

Mr. Acus testified that he had no problems seeing the defendant, who stood only 18 inches away during the robbery. Id. at 296-98, 301-02. These three victims carefully viewed petitioner both during commission of the robberies and the lineups and were confident of their identifications, all of which were made within two weeks of the crimes. Tr. I 425-64 (Brooks); 287 (Funck); 323 (Acus).

Lineup Identification by Effel

Although the lineup viewed by Ms. Effel was virtually identical to those lineups viewed by Funck, Brooks and Acus, the circumstances were slightly different and will be separately discussed. Ms. Effel testified that immediately before viewing the lineup, she heard undecipherable yelling. Tr. I 381. The yelling continued as she approached the lineup room, and she, at that point, recognized the voice as that of the robber who said "if you follow us out of here, I'm gonna kill you." Tr. I 383-

84; Tr. II 47.  Ms. Effel testified that the petitioner "talked constantly" during the robbery and continued talking about a set-up as Ms. Effel viewed the lineup.  Tr. I 384-85; Tr. II 72.

As a result, she first noticed petitioner's voice which "sounded the same and then the face, the head, the way he was moving, the way he was talking."  Tr. II 75.  Because she pointed to no other identifying factors and had originally failed to identify petitioner as her assailant from a photographic array, see H. 160-62; Tr. II 55, the conduct of the lineup while petitioner was talking arguably may be unduly suggestive. Raheem, 257 F.3d at 137 (quoting Israel v. Odom, 521 F.2d 1370, 1374 n.7 (7th Cir. 1975) (where witness had emphasized the assailant's eyeglasses, identification procedure suggestive when the defendant was the only lineup participant wearing glasses)).

However, petitioner is responsible for talking during the lineup when viewed by Ms. Effel.  Had he not refused to cooperate and not continued protesting through when Ms. Effel viewed the lineup, she would not have had the opportunity to focus on the sound of his voice.  Thus, for the reasons previously discussed above, the state court did not unreasonably apply federal law in determining that petitioner had waived his right to challenge the lineup procedures as to factors he himself caused.

Even if Ms. Effel's lineup was unduly suggestive, her identification was nonetheless independently reliable.  Ms. Effel testified she had at least several seconds to have a good, unobstructed view of the petitioner's face during the robbery.

Tr. I 369; Tr. II 46. In particular, she "was really focusing on him" after defendant punched her, and had no doubts that Holland was the person who had punched and robbed her. Tr. I 387; Tr. II 55. The lineup took place about two weeks after the incident occurred. Neither that length of time, nor the fact that Ms. Effel could not identify the defendant during photo identification procedures, demonstrate the unreliability of the identification.

Last, Ms. Effel's recognition of petitioner's voice augments the conclusion that her visual identification was reliable as she had an adequate opportunity to hear defendant talk incessantly throughout the robbery and lineup. As courts in the Second Circuit have found, the factors in Neil v. Biggers, 409 U.S. 188, are applicable to voice identifications and that voice identifications may be reliable. See, e.g., Brown v. Harris, 666 F.2d 782, 786-87 (2d Cir. 1981) (under the Biggers test, "suggestiveness is not enough: if the court is convinced that a witness's knowledge is not susceptible to suggestion, then the testimony can be received at trial"); see also Burtis v. Dalsheim, 536 F. Supp. 805, 807-08 (S.D.N.Y. 1982) (application of Biggers factors to voice identification favoring the prosecution despite victim's failure to provide any visual description since "the absence of a visual description does not by itself invalidate an otherwise acceptable identification") (citation omitted).

Thus, the trial court's admission of Ms. Effel's in-court

identification is neither contrary to nor an unreasonable application of federal law.

    B.  <u>Reopening Wade Hearing.</u>

Petitioner claims that the trial court violated his due process rights by failing to reopen the <u>Wade</u> hearing because several of the victims testified at trial that they had discussed their cases with each other immediately prior to their viewing of the lineup. <u>See</u> Pet. at 6. He also points to testimony that a detective told the victims they were having trouble with a suspect, after they had heard the disturbance coming from the lineup room, justified reopening the hearing. Petitioner's Brief before the Appellate Division, Second Dept. ("Pet. App. Div. Br.") at 47-48.

Respondent contends that petitioner has failed to exhaust this claim by failing to "fairly present" his constitutional claim to the highest state court. <u>See</u> <u>Picard</u>, 404 U.S. at 275. In fact, prior to the commencement of the second trial, counsel for petitioner renewed his motion to suppress the lineup based on the trial testimony. Tr. II 2-3. The trial court reserved decision and informed that parties that he would "let [them] know after lunch." Tr. II 4. Upon re-convening following the lunch recess, the trial judge called counsel to the bench for a discussion not reflected in the transcript. Tr. II 6. Later, as the prosecutor asked Ms. Effel whether she had spoken to either Detective Landy or Detective Orgias to viewing the lineup, the

trial judge again called counsel to the bench for another
unrecorded discussion. Tr. II 66-67. In light of this and the
fact that several sidebar discussions apparently were not
recorded,[12] the absence of any ruling on defendant's motion to
re-open the <u>Wade</u> hearing is not a basis for finding that
petitioner failed to raise this claim at trial.

Petitioner then raised the claim on direct appeal, to which
the respondent argued that the claim had been waived in prior
proceedings. Pet. App. Div. Br. at 46-49; Respondent's Brief
before the Appellate Division, Second Dept ("Resp. App. Div.
Br.") at 64-65. Although the Appellate Division did not
specifically address this aspect of petitioner's claims
challenging the lineup identifications, the court generally
affirmed the denial of the original suppression motion. <u>See</u>
<u>Holland</u>, 248 A.D.2d at 637. Significantly, the court did not
find the claim unpreserved for appellate review. Therefore, this
Court should treat this claim as properly exhausted and the
Appellate Division's general holding as a ruling on the merits to
which a habeas court must defer. <u>See</u> <u>Aparicio v. Artuz</u>, 269 F.3d
78, 93 (2d Cir. 2001) (deference must be accorded to Appellate
Division's cursory denial if there is nothing "to indicate that

---

[12]    The transcript of the second trial reflects several
instances where the trial judge called counsel to sidebar
immediately after a substantive issue was raised. <u>See</u>, <u>e.g.</u>, Tr.
II 6 (voir dire), 162 (voir dire); 2 (trial), 31, 65-66, 171,
179, 250, 341. Given the nature of the discussions between the
court and the parties preceding the sidebar, rulings may have
been made, but were not contained elsewhere in the record. <u>See</u>
<u>also</u> <u>infra</u> at n.13.

the claims were decided on anything but substantive grounds").

Although the witnesses had a brief opportunity prior to viewing the lineup to talk with each other about what happened to each of them, nothing in the record indicates that the witnesses discussed the appearance of their assailants. Tr. I 282 (Funck), 317-38 (Acus); 350 (Brooks); 380, 387, 438-90 (Effel). Ms. Effel recognized the defendant's voice at the lineup, but she and all the other witnesses testified that nothing about the commotion or comments they heard affected their identifications of the defendant at the lineup. Tr. I 248-49 (Funck); 321 (Acus), 324; 382, 385 (Effel); 441 (Brooks).

Further, only Mr. Funck and Mr. Acus testified that Detective Orgias told them that the suspect was being unruly. Tr. I 285 (Funck); 319 (Acus). Even though Mr. Funck and Mr. Brooks recognized the defendant's voice from the waiting room, neither heard the defendant when they viewed the lineup. Tr. I 247-48, 249, 286-87 (Funck); 440, 469, 470-71 (Brooks). Mr. Acus did not recognize the voice while he was in the waiting room. Tr. I 318. At the lineup, he heard a "little bit of noise" but could not hear what the defendant was saying. Tr. I 318, 321, 352. Ms. Effel, the only witness who testified to hearing the defendant during the lineup, also testified that she did not hear the detective's comments. Tr. I 351, 411.

Given the deferential standard of review, this Court finds that any state court decision not to re-open the Wade hearing to be proper under these circumstances. Moreover, even assuming

-37-

that the testimony at the first trial supported petitioner's claim that the lineup procedures were tainted, the record also amply supports a finding that all the identifications were independently reliable, for the reasons previously discussed. See supra at 29-30, 31-32.

III. MISTRIAL AS VIOLATION OF DOUBLE JEOPARDY PROSCRIPTIONS

Petitioner contends that the lower court violated constitutional proscriptions against double jeopardy by declaring a mistrial of the first trial. Pet. App. Div. Br. 29-35; Pet. Supp. Br. at 28-30. He argues that the trial court did not (1) sufficiently inquire as to whether a mistrial was actually necessary, (2) consider alternatives to a mistrial and (3) allow the jury enough time to deliberate. Id.; see also Pet. Supp. Br. at 28-30.

The Double Jeopardy clause, which provides that no person "shall ... be subject for the same offence to be twice put in jeopardy of life or limb," U.S. Const., Amend. V., is applicable to the states through the Fourteenth Amendment. Benton v. Maryland, 395 U.S. 784, 793-96 (1969). The clause does not bar the retrial of a defendant when a mistrial is prompted by "manifest necessity." See United States v. Perez, 22 U.S. (9 Wheat.) 579, 580 (1824); accord Arizona v. Washington, 434 U.S. 497, 505 (1978); United States v. Millan, 17 F.3d 14, 18-19 (2d Cir. 1993). The prototypical example of "manifest necessity" is that of the hung jury. As the Supreme Court acknowledged in

Richardson v. United States, 468 U.S. 317 (1984), "we have constantly adhered to the rule that a retrial following a 'hung jury' does not violate the Double Jeopardy clause." Richardson, 468 U.S. at 324-26; see also Sattazahn v. Pennsylvania, 537 U.S. 101, 108 (2003) (quoting Richardson, 468 U.S. 317, and declining to change holding in a capital case); Arizona v. Washington, 434 U.S. at 497 (noting that "without exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial"); United States v. Perez, 9 Wheat. 579 (1824)) (hung jury is the "prototypical example" of "manifest necessity").

The trial judge has "broad discretion" to declare a mistrial when he considers the jury deadlocked and such determination is accorded "great deference" by a reviewing court. Arizona, 434 U.S. at 509-510. Given the presumption of correctness accorded the trial judge's findings of fact under § 2254(e) of AEDPA and the established line of Supreme Court cases holding that a retrial following a "hung jury" does not violate a defendant's constitutional right, the trial court's declaration of mistrial clearly is neither contrary to Supreme Court law nor involves an unreasonable application of clearly established law. Yarborough v. Alvarado, 124 S. Ct. 2140 (2004).

In any event, the trial judge's determination to declare a mistrial comports with federal law. As the Second Circuit has explained, under Arizona v. Washington, a trial judge's decision should not be overruled unless mistrial was declared

"irrationally, irresponsibly or precipitately."  <u>Klein</u>, 582 F.2d
at 191.  Some of the factors that trial courts may consider in
determining whether a jury is deadlocked are:

> (1) a timely objection by defendant, (2) the jury's
> collective opinion that it cannot agree, (3) the length
> of deliberations of the jury, (4) the length of the
> trial, (5) the complexity of the issues presented to
> the jury, (6) any proper communications which the judge
> has had with the jury, and (7) the effects of possible
> exhaustion and the impact which coercion of further
> deliberations might have on the verdict.

<u>Campbell v. Brunnelle</u>, 925 F. Supp. 150, 155-56 (S.D.N.Y. 1996)

(footnotes omitted); (citing <u>Arnold v. McCarthy</u>, 566 F.2d 1377,

1387 (9th Cir. 1978)).  <u>See also</u> <u>United States v. Feijoo-Tomala</u>,

747 F. Supp. 181, 185 (E.D.N.Y. 1990) (same).

> <u>Timely objection by defendant.</u>

It is well recognized that "'a mistrial may be declared

without the defendant's consent and even over his objection, and

he may be retried consistently with the Fifth Amendment.'"

<u>United States v. Millan</u>, 17 F.3d 14, 19 (2d Cir. 1994) (quoting

<u>Gori v. United States</u>, 367 U.S. 364, 368 (1961)).  Where a

defendant either objects or fails to consent to a trial court's

declaration of a mistrial, double jeopardy will bar a second

prosecution unless there was a "manifest necessity" for the

mistrial.  <u>Maula v. Freckleton</u>, 972 F.2d 27, 29 (2d Cir. 1992)

(citing <u>United States v. Dinitz</u>, 424 U.S. 600, 606-07 (1976)).

Defendant's consent to declaration of a mistrial "'need not be

express, but may be implied from the totality of circumstances

attendant on a declaration of mistrial.'"  <u>United States v.</u>

Beckerman, 516 F.2d 905, 909 (2d Cir. 1975) (quoting United
States v. Goldstein, 479 F.2d 1061, 1067 (1973)).

Although the record does not contain any objection by the
defendant to a declaration of mistrial, when the trial judge did
declare a mistrial, he noted that it was "over the defense
objection to counts one, two and four" before excusing the jury.
Tr. I 749-50.[13]  Thus, this factor is weighed against declaration
of a mistrial.

### The jury's collective opinion that it cannot agree.

The jury's decision that it is deadlocked is a "'crucial
factor.'"  Campbell, 925 F. Supp. at 158 (quoting United States
v. Lansdown, 460 F.2d 164, 169-70 (4th Cir. 1972)); see also
Klein, 582 F.2d at 192 ("[W]here the record reveals a deadlocked
jury, the discretion of the trial court to declare a mistrial
will be upheld").  Although the record of deliberations is
incomplete and does not contain most of the jury notes and some
important bench discussions, it is clear from the sequence of
events that the trial court declared mistrial only after the jury
had attempted to reach consensus.  On the second day of
deliberations, the jury stated in a note made at around 4:30 p.m.
that it had difficulty in reaching agreement on five of the six
charges.  Tr. I 736, 739.  The jury apparently continued
deliberating even after sending this note.  After the jury

---

[13]  Before the declaration a mistrial, there was a sidebar
discussion which is not contained in the transcript.  Tr. I 746.
This is another instance where the transcript does not contain
statements which were acknowledged to have been made.

returned to the courtroom and the trial judge stated that he would receive a partial verdict, the foreperson indicated that the jury had changed positions after sending the note. Tr. I 737-38. The judge then told the jury that he would ignore the note and instructed them to go back to the jury room at 5:10 p.m. to decide whether to continue deliberating. Tr. I 738-39. The jury later returned to the courtroom at 5:50 p.m. and the trial court proceeded to receive a partial verdict. Tr. I 739-44.

At that point, the trial court explored the genuineness of the jury's claim that it was deadlocked. Tr. I 744-47. In response to the judge's questions, the foreperson unequivocally stated that the jury was deadlocked, that further deliberations on the remaining charges would be fruitless, and that there had been no movement on the deadlocked charges for some time. Tr. I 745-46. Prior to this exchange, the trial judge told the other jurors to raise their hands if they disagreed with the foreperson's answers. Tr. I 745. There was no indication in the record of either dissent or any request to inquire further of each juror.

Thus, in light of the unequivocal response of the foreperson and the absence of dissent from the other jurors regarding its deadlock, this factor supports the trial judge's declaration of the mistrial.

<u>The length of the deliberations.</u>

The fact that a mistrial is declared after a jury has deliberated for a relatively short period of time does not <u>ipso facto</u> warrant a conclusion that the Court acted improvidently. <u>Feijoo-Tomala</u>, 747 F. Supp. at 185 (citing <u>Lindsey v. Smith</u>, 820 F.2d 1137, 1155 (11th Cir. 1987)); <u>see</u> <u>also</u> <u>Arnold</u>, 566 F.2d at 1387 ("There is no minimum amount of time which a jury must spend in deliberations before a mistrial can be declared").  This factor is one which is best left to the determination of the trial judge who was most aware of the circumstances of the trial. <u>Arnold</u>, 566 F.2d at 1387.

The issues presented in this case are straightforward. Although trial concerned four separate robberies, each charge turned on one simple issue-- whether each victim properly identified the defendant as the perpetrator.  Although the trial testimony spanned three days and one morning, the actual trial time was not very long, due to numerous recesses.[14]  In light of this, the trial court's declaration of mistrial after jury deliberations, which lasted at least six hours,[15] was not unreasonable.  <u>See,</u> <u>e.g.</u>, <u>Shaw v. Norris</u>, 33 F.3d 958, 962 (8th

_____

[14]  The transcripts do not reflect the time that the court was in session.  However, gauging from the length of the transcript (not more than 150 pages the first three days and 86 pages the final day of testimony), this part of the trial probably did not take three days.

[15]  This estimate is based on the assumption that the jury deliberated during the following periods on October 4 -- 3:30 - 5:02 p.m., 5:11 - 6:17 p.m., 6:40 - 7:12 p.m. and on October 5 -- 10:30-11:55 a.m., 3:37 - 4:40 p.m., 5:10 - 5:50 p.m.

Cir. 1994) (mistrial declared after three and a half hours of deliberations after jury had announced that it had "sort of come to a stop" on one of the three counts, and then, approximately 45 minutes later, announced that it was "still not agreeable" on two counts); <u>United States v. Lorenzo</u>, 570 F.2d 294, 299 (9th Cir. 1978) (declaring a mistrial after jury deliberated for a little over three hours in a brief trial which presented no complex questions of fact and then indicated they were unable to reach a verdict); <u>United States v. Beckerman</u>, 516 F.2d 905, 908 (2d Cir. 1975) (declaring a mistrial after jury deliberated approximately seven hours following a three day trial on a one count indictment charging defendant with possession and intent to distribute narcotics); <u>United States v. Goldstein</u>, 479 F.2d 1061 (2d Cir. 1973) (mistrial declared after eight hours of deliberation following a five-week trial involving complex issues and almost 50 possible verdicts).

<u>Communications between the Judge and Jury.</u>

As discussed above, the jury had declared on its own initiative that it was deadlocked. Although the defendant has a "valued right to have his trial completed by a particular tribunal," <u>Wade v. Hunter</u>, 336 U.S. 684, 689 1949), that right is not absolute and "must in some instances be subordinate to the public's interest in fair trials designed to end in just judgments." <u>Id.</u> at 689. The Court must guard against "the significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of

-44-

all the jurors." <u>Arizona</u>, 434 U.S. at 509.

Ironically, petitioner also argues that the trial court failed to give an <u>Allen</u> charge to the jury.  Pet. Supp. Br. at 29.  Petitioner never raised this argument in state court and is procedurally defaulted from doing so.  In any event, such an argument is meritless.  Trial courts generally have "broad discretion to determine under what circumstances and how the [jury] charge should be given." <u>Smalls v. Batista</u>, 191 F.3d 272, 277 (2d Cir. 1999).  While a trial court has discretion to give such an <u>Allen</u> charge in order to encourage a deadlocked jury to reach a unanimous verdict, <u>Lowenfield v. Phelps</u>, 484 U.S. 231, 237-38 (1988), courts are mindful that an <u>Allen</u> charge may "coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts." <u>United States v. Ruggiero</u>, 928 F.2d 1289, 1299 (2d Cir. 1991)(citations omitted); <u>see also</u> <u>Smalls</u>, 191 F.3d at 278; <u>United States v. Robinson</u>, 560 F.2d 507, 517 (2d Cir. 1977) (en banc).  The concern is not over whether an <u>Allen</u> charge is given, but over the propriety of any supplemental charge which may unduly pressure the jury.  <u>Id.</u>

In this case, none of the trial judge's comments were coercive or otherwise improper.  After receiving a note that the jury was deadlocked on five of six counts, the trial judge simply told the jury to return to the jury room to determine whether it wanted to continue deliberations.  Thus, this factor also weighs in favor of a finding that the jury is deadlocked.

In sum, the relevant factors weigh heavily in favor of the

trial court's decision to declare a mistrial. See Millan, 17
F.3d at 19 ("the trial judge is best situated to decide
intelligently whether 'the ends of substantial justice cannot be
attained without discontinuing the trial'") (quoting Gori, 367
U.S. at 368).

For all of these reasons, this court finds that the state
court's decisions were neither contrary to nor an unreasonable
application of clearly established federal law, and that the
state court reasonably extended clearly established, Supreme
Court-defined governing legal principles to the instant
situation. See, e.g., Lockyer, 538 U.S. 63, 123 S. Ct. 1166
(2003).


IV.  PETITIONER'S MOTION TO STAY PROCEEDINGS

By letter applications on April 5th and July 29, 2004,
petitioner through counsel, requested that this Court hold the
matter in abeyance pending the trial court's ruling on his motion
filed on or about March 30, 2004, brought pursuant to New York
C.P.L. § 440.10 seeking to vacate his conviction on that basis
that he was denied effective assistance of counsel. See
generally Letters dated April 5, 2004 and July 29, 2004 ("Apr. 5
letter") ("July 29 letter") (to be docketed herewith).

In his section 440.10 motion, petitioner claimed that his
trial counsel was ineffective because he failed to argue at the
Wade hearing that (1) counsel failed to bring to the suppression
judge's attention that the defendant was represented by counsel

-46-

at the time of the lineup and that the police were aware of that fact; and (2) that counsel failed to interview and call to the stand an officer who took a report from David Funck, in order to impeach Mr. Funck's testimony.  <u>See</u> Petitioner's § 440.10 Motion ("§ 440.10 Mot.") at 11-20.  As his counsel noted,

> [t]his state proceeding is brought in anticipation of a claim that, with respect to petitioner's claim for habeas corpus relief, he has exhausted his claim in the state court.  It could be argued that the precise point made was not clearly made in the state court and accordingly was not exhausted.  This concerns his claim that he was represented by counsel at the time of the original lineup which he challenges as a deprivation to him of his right to counsel at that time.

<u>See</u> Apr. 5 letter.

On May 17, 2004, the Kings County Supreme Court issued an order ("May 17 Order") denying the petitioner's requests.  <u>See</u> transmittal of the May 17 Order from ADA Ferrell dated Sept. 20, 2004 (to be docketed herewith).  The state court determined that petitioners's claims were procedurally barred because all of the issues raised could have been raised on appeal "but were unjustifiably not raised."  May 17 Order at second page.  The state court also denied petitioner's motion on the merits holding that petitioner had no federal or state constitutional right to counsel at a pre-indictment lineup and that petitioner did not adequately demonstrate that he was denied effective assistance of counsel.  <u>See generally</u> May 17 Order at second through fourth pages.

It is not clear from the record whether petitioner has filed an appeal on this motion.  Irrespective of whether there is still

a pending motion in state court, no stay is warranted.

Plaintiff's section 440.10 motion was filed well after the expiration of the one year statute of limitations period under AEDPA. Because there is no tolling of the AEDPA limitations period while a petition is pending before a federal court, new claims that a petitioner may seek to raise in an amended petition are time-barred, unless they relate back to the original petition.[16] <u>Duncan v. Walker</u>, 533 U.S. 167, 181 (2001) (no tolling); <u>Zarvela v. Artuz</u>, 254 F.3d 374, 382 (2d Cir. 2001) (remanding to district court to determine whether new claim presented in refiled petition relates back to claims in the initial petition); <u>Fama v. Commissioner of Corr. Servs.</u>, 235 F.3d 804, 815-16 (2d Cir. 2000) (holding that Rule 15(c) governs whether an amended habeas petition relates back to an original petition). The key inquiry "is whether the original complaint gave the defendant fair notice of the newly alleged claims." <u>Fama</u>, 235 F.3d at 815 (internal quotation marks omitted); <u>see</u> <u>Tho Dinh Tran v. Alphouse Hotel Corp.</u>, 281 F.3d 23, 36 (2d Cir. 2002)

The prong of petitioner's argument relating to counsel's failure to call a witness simply has nothing to do with his

---

[16] The Court of Appeals denied petitioner's application to appeal the Appellate Division's order affirming his conviction on June 10, 1998. <u>People v. Holland</u>, 92 N.Y.2d 853, 699 N.E.2d 444, 677 N.Y.S.2d 84 (1998). The petitioner had 90 days to seek a writ of certiorari to the United States Supreme Court. <u>See</u> Sup. Ct. R. 13. Apparently, he did not do so. Therefore, petitioner's conviction became final on September 8, 1998 and the one-year statute of limitations began to run on this date. 28 U.S.C. § 2244(d)(1)(A). There is no dispute that the petitioner had timely filed his petition.

original claims concerning the lineup identifications and declaration of mistrial. Because this claim does not relate back, it is barred by the AEDPA limitations period.

While petitioner's criticism of counsel's performance for failing to claim that he was denied his right to counsel during the lineup arguably relates to his earlier challenges to the lineup, this claim is meritless. The right to counsel does not attach at a pretrial identification conducted before "the initiation of adversary judicial criminal proceedings whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Kirby v. Illinois, 406 U.S. 682, 687 (1971); Boyd v. Henderson, 555 F.3d 56 (2d Cir. 1977); Taylor v. Kuhlmann, 36 F. Supp. 2d 534 (E.D.N.Y. 1999). A federal court must look to state law to determine when adversarial judicial proceedings have begun for sixth amendment purposes. Meadows v. Kuhlmann, 812 F.2d 72, 76 (2d Cir.), cert. denied, 482 U.S. 915 (1987). Under New York law, the commencement of the adversarial process is triggered by either: (1) the filing of an accusatory instrument, (2) an arraignment, (3) an arrest warrant, or (4) a court removal order to transfer a prisoner to another location for the purpose of investigating a crime. Meadows, 812 F.2d at 77; People v. Jackson, 74 N.Y.2d 787, 545 N.Y.S.2d 95, 543 N.E.2d 738 (1989) (court removal order); People v. Blake, 35 N.Y.2d 331, 339, 361 N.Y.S.2d 881, 890-91, 320 N.E.2d 625 (1974) (arraignment, arrest warrant).

In the instant case, because the lineup occurred before an

accusatory instrument was filed against petitioner, he was not entitled to counsel. Kirby, 406 U.S. at 687. Relying on People v. Hawkins, 55 N.Y.2d 474, 435 N.E.2d 376 (1982), petitioner contends that he was entitled during the lineup to the attorney who represented him on another case that was pending for sentencing. See [§]440.10 Motion at 12. However, even if that claim had not been rejected by the state court, habeas corpus relief does not lie for mere errors of state law. Estelle v. McGuire, 502 U.S. 62, 68 (1991). Because petitioner's federal constitutional right to counsel was not infringed at the lineup, he is not entitled to habeas relief for counsel error in this regard. See also Boyd v. United States, 555 F.2d 56 (2d Cir. 1977) (suspect who had counsel for other pending charges had no right to counsel during show-up identification on another charge); Shepherd v. Portunda, Nos. 99-CV-1866 (JBW), 03-MISC-0066 (JBW), 2003 WL 22964538, at *7 (E.D.N.Y. Nov. 10, 2003) (no infringement of petitioner's federal constitutional right to counsel when petitioner participated in a lineup without counsel who represented him in another case); King v. Hodges, Nos. 01-CV-8341 (JBW), 03-MISC-0066 (JBW), 2003 WL 22952832, at 9-10 (E.D.N.Y. Nov. 10, 2003) (while petitioner's request for counsel representing him in another case should have been honored at the lineup, petitioner's federal constitutional right to counsel was not infringed).

## **CONCLUSION**

For the foregoing reasons, I respectfully recommend that the petition be denied and any request for a stay be denied. As petitioner has not made a substantial showing of the denial of a constitutional right, I further recommend that this Court deny any application by petitioner for a certificate of appealability. See Lozada v. United States, 107 F.3d 1011 (2d Cir. 1997) (district court may grant certificate), abrogated on other grounds by United States v. Perez, 129 F.3d 255, 259-60 (2d Cir. 1997)).

Copies of this report and recommendation will be mailed on this date to counsel of record. Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, by March 4, 2005. Failure to file objections within the specified time waives the right to appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

SO ORDERED.

Dated:      Brooklyn, New York
            February 11, 2005

            ____/s/_____
            MARILYN D. GO
            UNITED STATES MAGISTRATE JUDGE