```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------x

JOHNATHAN HOLLAND,

                Petitioner,
                                            ORDER
        - against -
                                            CV 99-5800(DGT)(MDG)
HANS WALKER, Superintendent,

                Respondent.

------------------------------------x
```

Trager, J.:

In an order filed on September 27, 2005, this Court adopted the Report and Recommendation ("Report") of Magistrate Judge Marilyn D. Go that the petitioner's application for a writ of habeas corpus be dismissed and that no certificate of appealablility be issued. Judgment was entered on September 30, 2005. On October 3, 2005, petitioner's counsel filed a request for a certificate of probable cause[1] ("Pet's Req.") (ct. doc. 54), along with a letter attaching counsel's prior objections to the Report (ct. doc. 55). By letter dated October 5, 2005, petitioner's counsel requested a rehearing based on Brisco v. Phillips, 376 F. Supp. 2d 306 (E.D.N.Y. 2005) and further

---

[1] In amendments contained in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), Congress replaced the prior procedural mechanism of a "certificate of probable cause" to appeal with a "certificate of appealability" ("COA"). See 28 U.S.C. § 2253.

supported both requests in a letter dated November 28, 2005.[2] On October 27, 2005, petitioner filed a notice of appeal pro se. (Ct. doc. 56).

For the following reasons, the requests are denied.

**Discussion**

Although petitioner does not identify the rule under which his requests are made, petitioner's requests will be treated as motions brought under Rule 59(e). Woodard v. Hardenfelder, 845 F. Supp. 960, 964 (E.D.N.Y. 1994) (citing McCowan v. Sears, Roebuck and Co., 906 F.2d 1099, 1103 (2d Cir.), cert. denied, 498 U.S. 897 (1990)). Since the motions were timely filed, the notice of appeal does not become effective until after disposition of the motions. Id., see also Hodge ex rel. Skiff v. Hodge, 269 F.3d 155, 157 n.4 (2d Cir. 2001).

**Request for a Certificate of Appealability**

Reiterating his objections to the Report and Recommendation of Judge Go, petitioner contends that the line-up was unduly suggestive since "he was the only person in the lineup shackled to the wall (the bars behind him)" and unable to hold up his number. Pet.'s Req. at ¶¶ 4-6. He further argues that it is "not too far fetched to apply the reasoning" of Deck v. Missouri, __ U.S. __, 125 S. Ct. 2007 (2005) to the instant case where

---

[2] Both letters, which were not filed electronically, will be separately docketed.

"there is an identifying showup where the defendant was in shackles" and no hearing on whether "the identifying witnesses viewed the shackled defendant..." Pet.'s Req. at ¶ 3; Letter dated November 28, 2005 of Eleanor Jackson Piel ("Nov. 28 Let.").

Petitioner's reliance on Deck is misplaced and his characterization of the lineup is not supported by the record. In Deck, the Supreme Court reversed a death sentence reached by a jury in a trial where a defendant was shackled with leg irons, handcuffs and a belly chain during the penalty phase. In contrast, petitioner was handcuffed to a chair with his hands behind him, rather than shackled to a bar, as he now argues. H. 43-45, 107. At the suppression hearing, both petitioner and Officer Orgias testified that, after a scuffle with officers, he was handcuffed and restrained in a chair by a chain through the cuffs, not shackled to a bar on the wall. H. 43-45, 107, 213. That petitioner was not visibly shacked to a bar is confirmed by a color photograph taken by Officer Orgias just before witnesses viewed the lineup. H. 61-62; Pet. Exh. 3. There is a horizontal bar on the wall just behind the petitioner, which extended just below shoulder level from slightly to the left of petitioner and behind a filler closely seated to the right of petitioner. Pet. Exh. 3. Neither petitioner's hands nor any handcuffs or "shackles"[3] are visible.

---

[3] Petitioner pointedly calls the restraints used on him as as "shackles," rather than "handcuffs." However, the Supreme Court in Deck, as well as most other courts, have used the term

Furthermore, contrary to petitioner's suggestion that no hearing was held on whether the identifying witnesses viewed the handcuffs or were affected by petitioner's appearance, see Nov. 28 Let., defense counsel examined the witnesses at trial regarding their observations of petitioner at the line-up. Tr. I 285-87 (Funck); 351-53 (Acus); 409-11 (Effel); 472-75 (Brooks). Three of the victims specifically recalled that all the men in the line-up held their hands behind them. Tr. I 249, 286, Tr. II 178 (Funck); Tr. I 321-23 (Acus); Tr. I 386 (Effel). The fourth victim recalled nothing unusual about petitioner's hands during the lineup. Tr. I 442-43 (Brooks). There is simply nothing to support petitioner's claim that the witnesses saw the petitioner's handcuffs or that they could tell that he was restrained during the line-up.

Moreover, as discussed in the Report, there was nothing distinctive about petitioner's appearance at the line-up. Report at 28-29. The fillers had similar physical appearances to the

---

"shackles" to refer to a different and more drastic type of restraint than handcuffs. See Deck, 125 S. Ct. at 2010 ("shackled with leg irons, handcuffs and a belly chain"). See also, e.g., Hudson v. McMillian, 503 U.S. 1, 4 (1992) (defendant in "handcuffs and shackles") (emphasis added); Pursley v. Dretke, 114 Fed. Appx. 630, 635 (5th Cir. 2004) ("shackles and handcuffs"); United States v. Fernandez, 388 F.3d 1199, 1245 (9th Cir. 2004) (district court ordered that "the incarcerated defendants 'would not be handcuffed,' that the shackles be 'padded to avoid noise,' that 'no one would stand when the jury entered the courtroom, to hide the fact that the defendants were restrained'"). But see Gonzalez v. Pliler, 341 F.3d 897. 899 (9th Cir. 2003) (generally using the term "shackle" to apply to hand and leg restraints).

petitioner, a fact confirmed by the photograph of the line-up taken by Detective Orgias included in petitioner's submissions. Tr. I 497-98 (Det. Landy); Tr. I 62; Petition, Ex. 3 (photograph). Only Mr. Funck testified that he noticed the petitioner was "sweaty[,] appeared angry [and] looked very agitated. Tr. I 249, 287. However, neither Mr. Funck nor any of the other witnesses noticed anything unusual about the defendant's appearance during the line-up. Tr. I 249, 287 (Funck); 316, 321, 323-24 (Acus); 386-87 (Effel); 438-43 (Brooks).[4]

Petitioner also claims that "the identifiers thought they heard him objecting to the proceeding in a loud voice" and that officers had referred to him as "the defendant." Id. at ¶ 6. These contentions are also not supported by the record. Only Mr. Acus recalled being told that there was "a problem with the defendant," but he did not recognize petitioner's voice. Tr. I 318, 319, 321, 351. Although Mr. Funck testified he was told

---

[4] Petitioner testified at the suppression hearing that his shirt was bloodied because he used it to wipe off blood from his face after being hit. H. 236. As Magistrate Judge Go discussed in her Report, the state trial court's finding that Holland's testimony was "incredible" is entitled to a presumption of correctness as well as the other testimony regarding petitioner's appearance which testimony was corroborated by the lineup photograph. Report at 29. Ignoring this discussion, petitioner suggests that Magistrate Judge Go was condoning the "bloodying [of] a defendant in a criminal case if the blood does not show too much." Objections to the Report and Recommendation of Magistrate Judge Go ("Pet. Obj.") (ct. doc. 49) at 6-7. This mischaracterizes both the factual and legal discussions in the Report.

there was an "unruly suspect" and recognized the defendant's voice from the waiting room, he did not hear the defendant talk when he viewed the lineup. Tr. I 247-48, 249, 285-87. Mr. Brooks also recognized the defendant's voice from the waiting room, but did not hear the defendant speak when viewing the lineup. Tr. I 440, 469, 470-71. Only Ms. Effel heard and recognized the defendant's voice when viewing the lineup, but she did not hear the detective's comments about an unruly suspect or a reference to the defendant. Tr. I 381-82, 384-85, 409-11. There simply is no evidence that petitioner's vociferousness or comments made by a detective to the witnesses in the waiting room affected the identifications made. On the contrary, all the witnesses testified that nothing about the commotion or comments they heard affected their identifications of the petitioner at the lineup. Tr. I 248-49 (Funck); 321, 324 (Acus); 382, 384 (Effel); 441 (Brooks).

To the extent there was undue suggestiveness at the line-up because of the way petitioner was restrained or because some witnesses recognized petitioner's voice, petitioner clearly was responsible for the commotion created and for talking during the line-up when viewed by Ms. Effel. Cf. Gilchrist v. O'Keefe, 260 F.3d 87, 95-95 (2d Cir. 2001) (defendant waived right to be present at trial because of disorderly and disruptive behavior); Boothe v. McLellan, 803 F. Supp. 586, 589-90 (E.D.N.Y. 1992) (petitioner's misconduct and disruptive behavior during voir dire

-6-

warranted being bound and gagged).

Again relying on Cotto v. Herbert, 331 F.3d 217 (2d Cir. 2003), petitioner argues "that certain constitutional rights cannot be waived because of the apparently wrongful conduct of the defendant." Pet. Obj. at 5-6. As discussed in the Report, Cotto is not applicable. Report at 30-31 n.11. Cotto concerned deprivation of a defendant's right of cross-examination for misconduct outside of the courtroom. The trial judge in Cotto barred the defendant from cross-examining an identifying witness at trial, after finding that the defendant had caused the witness to be "unavailable" by harassing the witness's family in order to influence the witness's testimony. 331 F.3d at 258. The Second Circuit reversed, holding that the complete preclusion of the defendant's right to cross-examine a witness deprived defendant and the jury of "the powerful tool of cross-examination, when the witness was literally available," in contravention of clearly established law. Id. at 252.

The issue here is disruptive behavior of the petitioner immediately before the lineup. As the Supreme Court has long recognized, "the Constitution sometimes permitted special measures, including physical restraints" at the trial of "an unusually obstreperous criminal defendant." Deck, 125 S. Ct. at 2011 (citing Illinois v. Allen, 397 U.S. 337, 343-44 (1970) (affirming conviction where defendant shackled and gagged at trial)). Petitioner admits that he resisted participating in the

-7-

lineup when taken from his cell and, in the lineup room, refused to hold up his number and took off his shirt. H. 206-08, 210-11. As he concedes, his "actions ... interfered with that purpose" and resulted in his being handcuffed. Pet. Obj. at 6. Thus, as the state appellate court properly found, petitioner's obstreperousness created the very condition which caused the police to handcuff him. See Report at 30 (quoting People v. Holland, 248 A.D.2d 636, 637 (2d Dep't 1998)).

Petitioner also incorporates by reference other arguments made in his objections to the Report which he does not specifically discuss in the instant requests. Clearly, petitioner has not provided any reason for reconsideration of these arguments. Nevertheless, I now detail my reasons for rejecting petitioner's objections to the extent they have not been discussed above and in my prior Order.

Without citing any authority, petitioner argues that "[t]he only way a line-up proceeding can be valid is if the circumstances are neutral[.]" Pet. Obj. at 6. He further argues that this court did not make a finding that the identification of the petitioner was based on an "independent source" from the lineup identification. Pet. Obj. at 7. Again, petitioner presumes inapplicable legal standards. Pretrial identification evidence will be precluded if it is the product of unduly suggestive procedures and the identification is not independently reliable. See Report at 25-26 (citing Raheem v. Kelly, 257 F.3d

122, 133 (2d Cir. 2001).

Even assuming that the admissibility of the identification evidence is conditioned upon "neutral" circumstances, nothing in the record indicates that the composition of the lineup was not neutral, in spite of petitioner's conduct, or that the police had created the conditions that affected the neutrality of the lineup. To the extent that petitioner is arguing that this court failed to consider whether the identifications were independently reliable, Judge Go already made that determination in her Report and Recommendation. See Report at 31-34. In any event, even had the lineup been unduly suggestive, petitioner had the opportunity to cross-examine each witness as to the reliability of their identification of him, as discussed above. See, e.g., Watkins v. Sowders, 449 U.S. 341, 347-49 (1981) (under due process clause, reliability of identification testimony can be sufficiently challenged through cross-examination and summation at trial rather than at Wade hearing).

Next, contending lack of manifest necessity when the trial court declared a mistrial, petitioner essentially reiterated arguments regarding double jeopardy that he presented in his petition. He also argues that the trial court should have sent the jury back for further deliberations on the two undecided remaining felonies rather than declare a mistrial.

All of these arguments were thoroughly addressed in the Report. The trial court has "broad discretion" to declare a

mistrial when he considers the jury deadlocked and such determination is accorded "great deference" by a reviewing court. Arizona v. Washington, 434 U.S. 497, 509-10 (1978). The jury declaration that it is unable to arrive at a verdict on the remaining counts is the "prototypical example" of manifest necessity for a mistrial declaration. See Oregon v. Kennedy, 456 U.S. 667, 672 (1982).

Rather than considering the various criteria for determining whether a jury is deadlocked, see Report at 39-40, petitioner argues that Judge Go "concedes in her opinion that the jury deliberated 'for a relatively short period of time.'" Report at 43. Not only does petitioner take Judge Go's findings out of context, he ignores the correct legal standards. See Report at 39-40. In finding that the jury deliberated for at least six hours, Judge Go also observed that the trial testimony did not last more than three days and that the issues were straightforward. Report at 43-44, n.14, 15. The length of the deliberations was but one of the six relevant factors Judge Go analyzed in reaching the conclusion that the trial court's decision to declare a mistrial was neither contrary to nor an unreasonable application of clearly established federal law. See Report at 40-46.

Petitioner also complains that the jury was not polled and that the trial judge failed to make a record that he had found "manifest necessity" in declaring a mistrial. Pet. Obj. at 8.

However, defense counsel did not request that the jury be polled nor did petitioner previously raise this argument in the petition, on direct appeal or in any collateral attack. Because petitioner is foreclosed from pursuing this claim in state court, it is deemed exhausted, but procedurally defaulted. Harris v. Reed, 489 U.S. 255, 263 n.9 (1989); Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994), cert. denied, 514 U.S. 1054 (1995); River v. Conway, 350 F. Supp. 2d 536, 547 (S.D.N.Y. 2004) (procedural bar arising from failure to raise objection to verdict or polling procedure). Federal review of a procedurally defaulted claim is barred unless petitioner can demonstrate "cause" and prejudice or that failure to consider the claim will result in a "fundamental miscarriage of justice." Murray v. Carrier, 477 U.S. 478, 485, 496 (1986); Vargas v. Keane, 86 F.3d 1273, 1280 (2d Cir.), cert. denied, 519 U.S. 895 (1996) (citations and internal quotations omitted).

Petitioner provides no explanation as to why he did not raise this claim on appeal. Nor would he be able to show "cause" for his procedural default since he has not challenged the effectiveness of appellate counsel. Bossett, 41 F.3d at 829; Moore v. Greiner, No. 02-CV-6122 (SAS), 2005 WL 2665667, at *11 (S.D.N.Y. Oct. 19, 2005).

In any event, the claim is meritless and not supported by the record. When the jury first notified the trial court that it could not come to an agreement on five of the six charges, the

trial judge informed the jury that he would take a partial verdict. Tr. I 737-39. However, before the verdict was taken, there was a change in the jury's position and the jury returned for further deliberations. Tr. I 738-39. After the jury returned to render a partial verdict on the third, fifth and sixth counts, Tr. I 740-41, the trial judge individually polled the jurors on the partial verdict. Tr. I 443-44. The trial judge then informed the jury that he would ask the foreperson some questions and told the other jurors that "if other people disagree with his answers, put up your hand and I'll get to you." Tr. I 745-46. The judge proceeded to question the foreperson regarding whether the jury could resolve the deadlock on the remaining counts. Tr. I 745-46. The record indicates that no juror raised his or her hand during questioning. The trial judge took a recess for defense counsel to confer with his client. Tr. I 746-47. When the court reconvened an hour later at 7:16 p.m. without the presence of the petitioner, defense counsel explained that his client had stated he felt ill. Tr. 746-48. Rejecting this explanation and finding that the petitioner had waived his appearance, the trial judge declared a mistrial, noting that he had taken the verdict in the defendant's presence and had "made all the necessary inquiries in his presence for a mistrial." Tr. I 749.

Petitioner cites no authority to support his claim that a trial court must "poll" a jury in order to find "manifest

-12-

necessity" for a mistrial.  The jury, without promptly from the court, reported twice during the first trial that it was deadlocked in deliberations.  Even though it did not poll each juror, the trial judge gave each juror an opportunity to express a different view from that announced by the foreperson before it properly found that the jury was deadlocked.  Woods v. Miller, No. 01-CV-1660 (JBW), 2003 WL 21812011, at *8 (E.D.N.Y. July 7, 2003) (no constitutional right to have jury polled).

Lastly, petitioner argues that because the trial court failed to sever all four cases, H. 238, he was tried on four "separate disconnected felonies in one trial[,]" and "each incident was subject to a spill-over prejudicial effect on the other incidents."  Pet. Obj. at 8.  This claim is procedurally defaulted since petitioner did not raise it in either the petition or for review by the state courts.  Again, petitioner can not show cause for his prior failure to raise this issue, nor was there actual prejudice or a fundamental miscarriage of justice.

Improper joinder, is not, in itself, error of a constitutional magnitude, unless "it results in prejudice so great as to deny a defendant['s] right to a fair trial."  United States v. Lane, 474 U.S. 438, 446 n.8 (1986).  A defendant seeking habeas relief based on a due process violation for improper joinder of offenses or defendants must prove that joinder resulted in actual prejudice.  See Herring v. Meachum, 11

F.3d 374, 377-378 (2d Cir. 1993), cert. denied, 511 U.S. 1059 (1994).  "[T]he emphasis must be on the word actual[] for, viewed clearly, it is only the consequences of joinder, over which the trial judge has much control, and not the joinder itself, which may render the trial fundamentally unfair."  Id. at 377 (citations and internal quotations omitted).  Although recognizing the prejudice inherent in joinder of two unrelated murder charges, the Second Circuit in Herring nonetheless found joinder to be a "constitutionally acceptable accommodation of the defendant's right to a fair trial."  Id. at 377.  Joinder is justified both by the expectation that the jury will "follow instructions in limiting this evidence to its proper function" and the governmental interests in conserving resources, minimizing delay and preventing inconvenience to witnesses.  Id. (quoting Spencer v. Texas, 385 U.S. 554, 562 (1967)); see also Zafiro v. United States, 506 U.S. 534, 537 (1993).

At the first trial, the trial judge instructed the jury twice that there were four separate incidents involving six offenses, and further instructed that the jury could "pick and choose which [offenses] []they] want to find him guilty on or not based on how [they] evaluate the evidence."  Tr. I 692-93l; 702-03.  The trial court also gave instructions on the specific elements of each offense that the prosecution had to prove.  Tr. I 709-21; see also Tr. I 712.  The habeas court must presume the jury followed these instructions "unless there is an

-14-

'overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." Herring, 11 F.3d at 378 (quoting Greer v. Miller, 483 U.S. 756, 766 n.8 (1987)).

The verdict rendered is proof that the jury at the first trial considered each the charges separately, since the jury convicted the petitioner on one count, acquitted him on two other counts, and was deadlocked on the remaining counts.  Further, the evidence with respect to each robbery was distinct and easily compartmentalized and the trial itself was not lengthy or unduly complex, the risk of jury confusion at the trial was also significantly limited.  See United States v. Chang An-Lo, 851 F.2d 547, 556 (2d Cir.) (defendants were not substantially prejudiced by joint trial where "the evidence with respect to each of the defendants was adequately straightforward that the jury could consider it without any significant spillover effect"), cert. denied, 488 U.S. 966 (1988).  Since no actual prejudice or miscarriage of justice resulted from the joinder of the offenses, this procedurally defaulted claim also fails.

For all of these reasons, this Court finds no reason to disturb the earlier ruling that no certificate of appealability be issued.

**Request for Reconsideration**

Petitioner requests rehearing in light of Judge Spatt's decision in <u>Brisco v. Phillips</u>, 376 F. Supp. 2d 306 (E.D.N.Y. 2005). The standard for granting a motion for reconsideration is strict. <u>See</u> <u>Schrader v. CSX Transp., Inc.</u>, 70 F.3d 255, 257 (2d Cir. 1995). Such a motion generally will be denied unless the "moving party can point to controlling decisions or data that the court overlooked--matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." <u>Id.</u>

<u>Brisco</u> involved a showup, rather than a lineup, where the victim identified a suspect surrounded by three officers who was nude from the waist up and made to hold up a pair of shorts of the color as the shorts worn by the perpetrator. 376 F. Supp. 2d at 315. The facts and circumstances in <u>Brisco</u> are so different from this case that even if the decision were controlling, nothing in that case would alter this Court's previous determinations.

**Conclusion**

For the foregoing reasons, petitioner's requests for a certificate of appealability and for reconsideration are denied. SO ORDERED.

Dated:   Brooklyn, New York
         December 30, 2005

                                    /s/
                              DAVID G. TRAGER
                              UNITED STATES DISTRICT JUDGE

-16-